# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **WAYNE E. RATLIFF,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:07CV00029 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | By:  James P. Jones |
| **COMMISSIONER OF** | ) | Chief United States District Judge |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| Defendant. | ) | |

*Roger W. Rutherford, Wolfe, Williams & Rutherford, Norton, Virginia, for Plaintiff; Thomas C. Buchanan, Special Assistant United States Attorney, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

Wayne E. Ratliff filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act ("Act"), 42 U.S.C.A. §§ 401-433 (West 2003 & Supp. 2008).  Jurisdiction of this court exists pursuant to 42 U.S.C.A. § 405(g).

My review under the Act is limited to a determination as to whether there is substantial evidence to support the Commissioner's final decision. If substantial evidence exists, the court's "inquiry must terminate," and the final decision of the Commissioner must be affirmed. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.*

The plaintiff applied for DIB on January 6, 2004, alleging disability beginning January 5, 2004, due to breathing difficulties, back pain and nerves. (R. at 68-69, 76.) The claims were denied initially on May 19, 2004 (R. at 30), and upon reconsideration on October 12, 2004 (R. at 31).

On November 8, 2004, the plaintiff filed a request for a hearing before an administrative law judge ("ALJ"). (R. at 42.) A hearing was held on October 19, 2005. (R. at 280-330.) The plaintiff, who was present and represented by counsel, testified at the hearing. (*Id*.) By decision dated December 30, 2005, the ALJ denied the plaintiff's claim for DIB. (R. at 19-28.)

The plaintiff then filed a request for review with the Social Security Administration's Appeals Council ("Appeals Council") on January 12, 2006 (R. at 259), but by a notice dated April 2, 2007, the Appeals Council denied the plaintiff's

-2-

request for review (R. at 11-14). Thus, the ALJ's opinion constitutes the final decision of the Commissioner. The plaintiff then filed a complaint with this court objecting to this final decision of the Commissioner.

The parties have filed cross motions for summary judgment and have briefed the issues. The case is now ripe for decision.

II

The summary judgment record reveals the following facts. The plaintiff was fifty years old at the time of the ALJ's decision, making him an individual closely approaching advanced age under the Commissioner's Regulations. *See* 20 C.F.R. § 404.1563(d) (2008). He has a high school education and past work experience in the mining industry as a miner operator, a belt examiner, a plant electrician, and a plant operator. (R. at 77, 82, 88-92, 286-93.)

The plaintiff seeks disability due to breathing difficulties, episodes of lost consciousness, back and neck pain, numbness and tingling in his hands, migraines, and nerves. (R. at 76, 293-312.) He dates his disability to January 5, 2004, when he was told by his primary physician, J.P. Sutherland, Jr., D.O., that he was "totally and permanently disabled" and unable to perform any gainful employment. (R. at 76, 227, 229.)

-3-

Medical records indicate that prior to this drastic assessment, Dr. Sutherland had seen the plaintiff eleven times and made numerous diagnoses, including chronic bronchitis with emphysema; interstitial pulmonary fibrosis; sinus infections; inflamation of the esophagus; osteoarthritis, degenerative disc disease, and pain in the lumbar spine; inflammation in his left shoulder joint, right elbow, and ribs; carpal tunnel syndrome and inflammation of the right hand; migraine headaches; anxiety; chronic fatigue and pain syndromes; vertigo with dizziness and syncope or fainting; irritable bowel syndrome; and gastroenteritis. (R. at 228-38.)

Dr. Sutherland's treatment notes are sparse and provide little support for his diagnoses, including no support for the plaintiff's alleged headaches, anxiety, chronic fatigue and pain, and vertigo. (R. at 228-38.) To support his diagnoses of the plaintiff's osteoarthritis, degenerative disc disease, inflammation of the left shoulder and right elbow, and pain, inflammation, and carpal tunnel syndrome in the right hand, Dr. Sutherland observed only a decreased range of motion in the plaintiff's lumbar spine that complicated the plaintiff's ability to lift, bend, stoop, and squat, bilateral leg lift of thirty-five degrees, decreased range of motion in the left shoulder joint, right elbow, and right hand, and swelling of the right elbow. (R. at 229, 231-35.) However, with respect to the plaintiff's breathing difficulties, Dr. Sutherland routinely noted symptoms such as moderate to severe shortness of breath, rattling and

-4-

wheezing noises accompanying the plaintiff's breaths, redness or inflamation of the throat, swelling of the mucous membranes in the nose, coughing with sputum, and bronchial spasms because of difficulty taking in full breaths. (R. at 228-38.)

In addition to these observations, Dr. Sutherland's treatment notes indicate that diagnostic tests such as chest and hand X rays were performed (R. at 228, 232); however, these were not included in Dr. Sutherland's medical evidence (*see* R. at 221-38, 244-47). Dr. Sutherland treated the plaintiff's ailments with numerous prescription medications—including antibiotics, brochodilators, painkillers, antihistamines, digestion aids, and medications for anxiety, depression, acid reflux, coughing, inflammation, asthma, epilepsy, irritable bowel syndrome, and ulcers of the esophagus—and referred the plaintiff to several specialists. (*Id.*)

After he stopped working on January 5, 2004, the plaintiff continued to receive treatment from Dr. Sutherland, visiting him ten times between January 14, 2004, and September 8, 2005. (R. at 221-26, 244-47.) During this time period, Dr. Sutherland reiterated his previous diagnoses and additionally diagnosed the plaintiff with chronic obstructive pulmonary disease; acute asthma; bronchiectasis; esophagitis; muscle spasms; cervical disc syndrome; carpal tunnel syndrome, of the left hand as well as the right; Raynaud's phenomenon, in which there is decreased blood flow to the hands and fingers; elevated levels of lipids in the bloodstream; and diverticulitis.

-5-

(*Id.*) As before, his treatment notes are sparse, however, he routinely noted the plaintiff's shortness of breath, rattling and wheezing, coughing with sputum, and redness or inflammation of the throat. (*Id.*) He also observed irritation of the esophagus and a healed ulcer in the digestive track. (R. at 223.) His notes indicate that the plaintiff had decreased range of motion in the lumbar and cervical regions of the spine, his right shoulder and both hands, and a bilateral leg lift of thirty-five degrees. (R. at 221-23, 244-46.) Dr. Sutherland also noted that an X ray of the plaintiff's cervical spine shows bone spurs often associated with osteoarthritis and irritation of the joints (R. at 223), however, this X ray is not included in Dr. Sutherland's records (*see* R. at 221-238, 244-47). He continued to prescribe numerous medications to treat the plaintiff's ailments and mentioned referring the plaintiff to several more specialists. (R. at 221-26, 244-47.)

Dr. Sutherland completed assessments of the plaintiff's physical abilities, one on March 17, 2005 (R. at 239-40), and another on October 3, 2005 (R. at 248-49). He determined that the plaintiff could lift or carry up to twenty pounds occasionally and five pounds frequently; stand or walk for a total of two hours in an eight-hour workday and for fifteen minutes without interruption; and sit for a total of three hours in an eight-hour workday and for thirty minutes without interruption. (R. at 239, 248.) He further determined that the plaintiff could not climb, stoop, kneel, crouch

-6-

or crawl; could balance only occasionally; was limited in his ability to reach, handle, feel, push or pull; and must avoid hazards such as heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity, and vibration. (R. at 240, 249.)[1]

Between January and April 2003, the plaintiff saw neurologist Shawn K. Nelson, M.D., for complaints of episodic loss of consciousness.[2] (R. at 178-191.) The plaintiff stated that these episodes had started in December 2002; included tremors or jerking, slurred speech, and disorientation; and lasted from half a minute to five minutes in length. (R. at 183.) He also reported experiencing periodic dizziness and difficulty sleeping. (R. at 184.) After reviewing the plaintiff's "largely unremarkable" EEG and MRI results, Dr. Nelson concluded that the plaintiff suffered from episodes of impaired awareness of unknown etiology and unrelated positional vertigo. (R. at 180, 182.) He prescribed the plaintiff an antiepileptic on a trial basis and warned him against engaging in dangerous solitary activity or driving. (R. at 180, 182, 184.) The plaintiff later reported that he had tried the medication for a

---

[1] In the March assessment, Dr. Sutherland had determined that the plaintiff could kneel occasionally, but by the time of the October assessment he changed this to reflect that the plaintiff should not kneel at all. (R. at 240, 249.)

[2] Dr. Sutherland apparently referred the plaintiff to Dr. Nelson (R. at 183-85), although at no point in Dr. Sutherland's treatment notes does he mention that the plaintiff had experienced loss of consciousness. (R. at 221-38, 244-47.)

-7-

period, but then stopped, and that his episodes had "leveled off" but not gone away entirely. (R. at 178.)

In October 2003, the plaintiff saw Dr. Nelson with complaints of numbness, weakness, and pain in his right hand. (R. at 178-79.) Dr. Nelson noted that the plaintiff's reflexes and arm strength were intact and that there was no focal atrophy. (*Id.*) Nerve conduction and EMG studies produced mostly normal results, but indicated that the plaintiff had reduced sensory amplitudes. (R. at 178, 186-88.) Dr. Nelson concluded that the clinical examination and diagnostic tests did not explain the plaintiff's reported symptoms.[3] (R. at 178.)

On February 6, 2004, Emory H. Robinette, M.D., conducted a test to measure the plaintiff's pulmonary function and found that the plaintiff had normal spirometry, but with mild air trapping and a mild reduction in diffusion capacity. (R. at 192-95.) Arterial blood gas studies were normal except that the plaintiff had an elevated level of carboxyhemoglobin, a complex formed when carbon monoxide is inhaled and

---

[3] Dr. Nelson stated that

> the numbness he describes is in a radial distribution. I could not demonstrate a radial neuropathy, however. The responses were symmetric bilaterally. The sensory amplitudes were reduced . . . suggesting that he could have an underlying sensory polyneuropathy. This condition, however, does not clearly explain the more focal symptoms he describes in his right hand.

(R. at 178.)

-8-

which can indicate oxygen deprivation. (*Id.*) An earlier test, conducted on June 15, 2001, showed normal pulmonary function with only mild reduction in diffusion capacity. (R. at 196-99.)

The plaintiff had a consultative examination with Faisal Chaudhry, M.D., on April 5, 2004. (R. at 200-05.) Dr. Chaudhry observed no rattling or wheezing accompanying the plaintiff's breath, but noted that the plaintiff did seem to have shortness of breath during the examination. (R. at 202.) The plaintiff had normal range of motion, normal straight leg raises and intact motor, sensory, and cranial nerves. (*Id.*) X rays of the chest and lumbar spine revealed "nonspecific slightly prominent bronchovascular markings" and "very minimal" bony spur of the upper lumbar spine. (R. at 206.) Dr. Chaudhry concluded that the plaintiff suffered from chronic obstructive pulmonary disease with dyspnea or emphysema and chronic mechanical back pain. (R. at 202.) Dr. Chaudhry stated that the plaintiff could sit or stand for six hours in an eight-hour workday and walk for four hours in an eight-hour workday without any assistive device. (R. at 203.) He further found that the plaintiff had no limitation in his ability to kneel, crawl, or squat, and no manipulative or environmental limitation "other than his dyspnea." (*Id.*)

State agency physicians reviewed the medical evidence to assess the plaintiff's physical residual functional capacity. (R. at 207-20.) On May 19, 2004, Frank M.

Johnson, M.D., found that the plaintiff retained the ability to lift or carry up to fifty pounds occasionally and twenty-five pounds frequently; to stand, walk or sit up to six hours in an eight-hour workday; and to push or pull without limitations. (R. at 208.) Dr. Johnson further found that the plaintiff had no postural, manipulative or environmental limitations, except that he must avoid all exposure to fumes, odors, dusts, gases and poor ventilation, and opined that the plaintiff's alleged symptoms and limitations "do not appear fully credible based on the evidence in file." (R. at 209-11.) Michael J. Hartman, M.D., completed an assessment of the plaintiff's residual functional capacity on October 6, 2004. (R. at 215-20.) His assessment was similar to that of Dr. Johnson, except that he found that the plaintiff should never climb ladders, ropes or scaffolds, was limited in his ability to handle objects with his right hand, and should avoid all exposure to hazards such as machinery and heights. (R. at 215-18.) Dr. Hartman noted that the plaintiff "described daily activities that are not significantly limited in relation to his alleged symptoms" and he found the plaintiff's statements only partially credible. (R. at 220.)

State agency psychologist Howard Leizer, Ph.D., reviewed the medical evidence to assess the plaintiff's mental state on May 19, 2004, and this assessment was affirmed by another state agency psychologist, E. Hugh Tenison, Ph.D., on October 8, 2004. (R. at 164-77.) Drs. Leizer and Tenison determined that the

-10-

plaintiff was suffering from anxiety that was "not severe" and posed only a mild limitation on the plaintiff's ability to maintain concentration, persistence, or pace. (R. at 164, 169, 174.) Dr. Leizer noted that the plaintiff's treating physician had diagnosed him with anxiety, but had prescribed no medications to treat this.[4] (R. at 176.) Dr. Leizer found that the plaintiff's allegations regarding his anxiety were not credible. (*Id.*)

On October 19, 2005, the plaintiff had a hearing before the ALJ. (R. at 280-330.) At this time, the plaintiff's counsel provided the ALJ with a pre-hearing memorandum that listed twelve proposed "severe" impairments: asthmatic bronchitis, chronic obstructive pulmonary disease, degenerative disc disease, chronic neck and back pain, irritable bowel syndrome, bilateral carpal tunnel syndrome, migraine headaches, positional vertigo with episodes of syncope, stress anxiety disorder, reflux esophagitis, bursitis in the left shoulder, and synotenovitis in the right shoulder. (R. at 135-38, 283.) This memorandum also noted that the plaintiff had surgery for his esophagitis in January 2005, but that hospital records could not be located. (R. at 137, 284.)

---

[4] It appears that Dr. Sutherland prescribed anti-anxiety medications to the plaintiff in January and February 2003, but did not prescribe these again until November 2004. (R. at 223, 237-38, 244, 246).

-11-

At this hearing, the plaintiff testified about his work history, alleged impairments, and functional limitations. He stated that he had difficulty climbing stairs and walking more than 100 yards without resting, and lifting more than ten pounds. (R. at 300, 304.) His reported activities of daily living included: watching television, sitting and talking with visitors, playing computer games, walking to the mailbox, fixing sandwiches for lunch, attending church weekly and driving occasionally, using his left hand to steer. (R. at 306, 309-12.) He alleged that he has coughing spells lasting up to three or four hours in length and must lay down for three or more hours each day because of fatigue. (R. at 302.) The ALJ noted that the plaintiff had been coughing a lot during the hearing. (R. at 313.)

A vocational expert also testified at this hearing. (R. at 313-329.) He classified the plaintiff's past relevant work in the mining industry as medium to heavy, in term of exertion, and skilled, but noted that none of these skills were transferable outside the mining industry. (R. at 317-19.) The ALJ asked the vocational expert to consider various hypothetical situations, including whether jobs existed in significant numbers for an individual the same age as the plaintiff, with his same education and background, who was restricted to a range of light work. (R. at 319-29.) Specifically, the ALJ limited the physical abilities of this hypothetical individual to lifting and carrying up to twenty pounds occasionally and ten pounds

-12-

frequently; sitting up to six hours, standing up to six hours, and walking up to four hours, during an eight-hour workday; and occasionally climbing stairs and ramps; but noted that this hypothetical individual could never climb ladders, ropes, or scaffolds or balance; and must avoid hazards, such as machinery and heights, and all exposure to dust, smoke, fumes, or odors.  (R. at 319, 323.)

In response, the vocational expert concluded that the hypothetical individual would be unable to return to any of the work previously performed by the plaintiff. (*See* R. at 319-320.)  The vocational expert identified several jobs that could be performed by such an individual, including that of order caller, for which there are 100,000 positions nationally and 2,000 regionally; cashier, for which there are 700,000 positions nationally and 5,000 regionally; and bagger, for which there are 200,000 positions nationally and 4,000 regionally.  (R. at 320-23.)

After the ALJ rendered his decision, the plaintiff submitted additional medical evidence to the Appeals Council, including treatment records from Cumberland Mountain Community Services where the plaintiff was seen in January 2006 for depression (R. at 262-68), additional records from Dr. Sutherland completed between September 8, 2005, and May 8, 2006 (R. at 269-75, 279B-C), and notes from a diagnostic interview completed by a licensed clinical psychologist on March 28, 2003 (R. at 277-79).  The Appeals Council determined that these new records were either

Case 2:07-cv-00029-JPJ-PMS   Document 12   Filed 09/22/08   Page 13 of 22   Pageid#: 78

duplicative or covered a period beyond that under consideration by the ALJ and concluded that these did not provide a basis for changing the ALJ's decision.[5] (R. at 12.)

## III

A plaintiff bears the burden of proving that he is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. A plaintiff must show that his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. § 423 (d)(2)(A).

The Commissioner applies a five-step sequential evaluation process in assessing DIB claims. The Commissioner considers whether the claimant (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return

---

[5] It appears that while most of this additional evidence was duplicative or covered the period after the ALJ's decision, the diagnostic interview completed by the psychologist was new evidence relating to the period prior to the ALJ's decision, and was potentially relevant. However, this evidence concerns the plaintiff's mental state, an aspect of the ALJ's decision that the plaintiff has not challenged.

-14-

to his past relevant work; and (5) if not, whether he could perform other work present in the national economy. *See* 20 C.F.R. § 404.1520(a)(4) (2007). If it is determined at any point in the five-step analysis that the claimant is not disabled, then the inquiry immediately ceases. *See id*.; *Bowen v. Yuckert*, 482 U.S. 137, 141-42 (1987).

My review is limited to a determination of whether there is substantial evidence to support the Commissioner's final decision and whether the correct legal standard has been applied. 42 U.S.C.A. § 405(g); *see Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). If substantial evidence exists, the final decision of the Commissioner must be affirmed. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotations omitted). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws*, 368 F.2d at 642. It is the role of the ALJ to resolve evidentiary conflicts, including inconsistences in the evidence. It is not the role of this court to substitute its judgment for that of the Commissioner, as long as substantial evidence provides a basis for the Commissioner's decisions. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

After considering the treatment records and opinions of medical professionals and the testimony of the plaintiff and the vocational expert, the ALJ determined that

the plaintiff retained the residual functional capacity to perform a significant number of jobs, requiring only light work, in the national economy, and was, therefore, not disabled. (R. at 20-27.) He found that the plaintiff's chronic obstructive pulmonary disease and chronic mechanical back pain constituted severe impairments, but that these did not meet or equal the severity of any listed impairment. (R. at 23-4, 27.)

The ALJ further found that the plaintiff's arm and hand problems were not severe because they resulted in only a mild reduction in function and that the plaintiff's episodes of loss of consciousness and syncope were not medically determinable because they were not confirmed by a definitive diagnosis based on objective evidence. (R. at 23.) In assessing the plaintiff's residual functional capacity, he determined that the plaintiff was able to lift or carry up to twenty pounds occasionally and ten pounds frequently, to sit or stand for up to six hours each and walk up to four hours in an eight-hour workday, and to occasionally climb stairs and ramps, but that he could not climb ladders, ropes, or scaffolds or balance and must avoid hazardous areas and environments with dust, fumes, gases or odors. (R. at 25, 27.) Because of these limitations, the plaintiff did not retain the capacity to return to his past work, but could perform a significant number of light jobs, including order caller, cashier, and bagger. (R. at 26, 28.) In reaching his decision that the plaintiff

-16-

was not disabled, the ALJ found that the plaintiff's testimony "was not fully persuasive regarding his symptomatology and resulting limitations." (R. at 27.)

The plaintiff contends that the ALJ erred in not giving proper weight to the opinion of his treating physician, Dr. Sutherland, and in failing to consider the effects of the plaintiff's hand, arm, and shoulder impairments, chronic fatigue, and loss of consciousness or vertigo in determining his residual functional capacity. (Br. Supp. Pl.'s Mot. Summ. J. 8, 17.)

As the plaintiff states, a treating physician's opinion is accorded great weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). However, if a treating physician's opinion is not supported by clinical evidence or is inconsistent with other evidence of record, it is entitled to significantly less weight. *Id.*; 20 C.F.R. § 404.1527(d)(2). Here, the ALJ properly considered Dr. Sutherland's opinion, but reasonably concluded that it was neither supported by objective medical evidence nor consistent with the other evidence of record and was entitled to very little weight. (R. at 25.)

As discussed above, Dr. Sutherland's treatment records are sparse, often including diagnoses without any recorded clinical observations or diagnostic testing

-17-

for support. For example he provided no testing or observations to support his diagnoses of migraine headaches, anxiety, chronic fatigue and pain, and vertigo. Dr. Sutherland's diagnoses were also often inconsistent with the other medical evidence of record. For example, to support his diagnosis of osteoarthritis and of degenerative disc disease, he noted a decreased range of motion in the plaintiff's lumbar spine and bilateral leg lift of thirty-five degrees. However, this is inconsistent with Dr. Chaudhry's clinical evaluation in which he observed normal range of motion, normal straight leg raises and intact motor, sensory, and cranial nerves. Dr. Sutherland also diagnosed the plaintiff with inflammation and carpal tunnel syndrome of the right hand, despite nerve conduction and EMG studies conducted by Dr. Nelson that produced mostly normal results. I find that the ALJ's decision to accord very little weight to the opinion was Dr. Sutherland was reasonable.

The plaintiff further argues that the ALJ's residual functional capacity determination is not supported by substantial evidence in that he failed to consider the functional limitations caused by the plaintiff's hand, arm, and shoulder impairments, chronic fatigue, and loss of consciousness or vertigo. I find that the ALJ's residual functional capacity determination is supported by substantial evidence because it is completely consistent with the well-supported opinion of Dr. Chaudhry,

as well as reported diagnostic tests, and that the ALJ did fully account for all plaintiff's alleged functional limitations.

The ALJ determined that, despite having severe impairments, the plaintiff retained the capacity to perform a wide range of light work, including lifting up to twenty pounds occasionally and ten pounds frequently; sitting or standing up to six hours each and walking up to four hours in an eight-hour day; and climbing stairs and ramps occasionally. He limited this range of work to exclude positions requiring climbing ropes, ladders, and scaffolds, balancing, or exposure to hazards or environments with dust, fumes, gases, or odors. This echoes Dr. Chaudhry's opinion regarding the plaintiff's functional capacity.

The plaintiff alleges that he experiences numbness and tingling in his arms and hands, particularly in his right hand, that make it difficult to grip and hold objects. However, Dr. Nelson opined that his clinical examination and diagnostic testing did not explain the plaintiff's alleged symptoms. While the plaintiff described numbness in a radial distribution with more focused symptoms in his right hand, Dr. Nelson found that the plaintiff's responses in clinical testing were not consistent with a radial neuropathy and were similar in the right and left hands. Dr. Nelson noted that the plaintiff's reflexes and arm strength were intact and there was no focal atrophy. The nerve conduction and EMG studies he conducted were largely normal, indicating only

-19-

that the plaintiff had reduced sensory amplitudes. Likewise, Dr. Chaudhry noted no non-exertional limitations on the plaintiff's ability to use his arms or hands, nor did Dr. Johnson, one of the state agency physicians.

The plaintiff relies on the medical opinions of Dr. Sutherland and the other state agency physician, Dr. Hartman, to establish shoulder, arm, and hand impairments that would limit his ability to work. As previously discussed Dr. Sutherland's opinion was reasonably accorded little weight by the ALJ. While Dr. Hartman noted that the plaintiff's medical records included carpal tunnel symptoms in his right hand, he did not list this as a medically determinable impairment and did not explain how the plaintiff's ability to handle with his right hand was limited. Therefore, I conclude that the ALJ did not err in giving greater weight to the opinions of Drs. Nelson and Chaudhry than to that of Dr. Hartman.

The plaintiff also alleges chronic fatigue syndrome that requires him to spend three or more hours a day lying down. The only physician to diagnose chronic fatigue syndrome was Dr. Sutherland, who offered no clinical observations or diagnostic tests in support of this diagnosis. While, Dr. Nelson did note that the plaintiff complained of problems sleeping, a plaintiff's subjective complaints, even if relayed by a doctor, are insufficient to establish a medically determinable impairment. *See Craig*, 76 F.3d at 590 n.2 ("There is nothing objective about a doctor saying, without more, 'I

-20-

observed my patient telling me she was in pain.'"). In addition, in his pre-hearing memorandum the plaintiff proposed twelve severe impairments for the ALJ's consideration, but did not include chronic fatigue syndrome in this list. As there is no objective evidence to support a medically determinable impairment of chronic fatigue, the ALJ did not err in not crediting the plaintiff's subjective statements regarding his fatigue.

Finally, the plaintiff argues that ALJ erred in concluding that the plaintiff's alleged episodes of loss of consciousness, vertigo, and syncope were not medically determinable. While Dr. Sutherland diagnosed the plaintiff with vertigo with dizziness and syncope, he failed to provide any support in terms of clinical observations or diagnostic tests and so the ALJ reasonably gave little weight to his opinion. Dr. Nelson also treated the plaintiff for these complaints, but his treatment records include only self-reported symptoms and no clinical observations.[6] EEG and MRI tests conducted by Dr. Nelson produced "largely unremarkable" results and did not offer any objective support for these diagnoses. As a precaution, Dr. Nelson prescribed the plaintiff antiepileptic medication and warned him against engaging in

---

[6] Because Dr. Nelson never witnessed one of the plaintiff's episodes, he relied exclusively on symptoms reported by the plaintiff and his wife. Dr. Nelson did note, however, that the plaintiff reported having an episode in front of Dr. Sutherland who did not think it was a seizure. (R. at 180.) Dr. Sutherland made no indication in his treatment notes that he had witnessed the plaintiff having an episode of loss of consciousness or symptoms of vertigo or syncope.

dangerous solo activities and driving; however, the plaintiff later reported that he had stopped taking this medication and that he continued to drive. Because there is no objective medical evidence to support the plaintiff's alleged episodes of loss of consciousness, vertigo, and syncope, and because the plaintiff's behavior casts doubt on the credibility of his allegations, I believe that the ALJ did not err in finding that these alleged impairments were not medically determinable. Despite so finding, the ALJ did accommodate these allegations in determining the plaintiff's residual functional capacity. He limited the plaintiff to activities that would not require climbing ropes, ladders, or scaffolds, balancing, or exposure to hazards, such as machinery or heights.

I therefore find no error in the ALJ's decision that the plaintiff is not disabled within the meaning of the Act.


IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the Commissioner's Motion for Summary Judgment will be granted. An appropriate final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: September 22, 2008

/s/  JAMES P. JONES
Chief United States District Judge